## A. B. HERVEY JR., COMMISSIONER OF REVENUES *v.* INTERNATIONAL PAPER COMPANY ET AL

5-5927                      483 S.W. 2d 199

### Opinion delivered June 26, 1972
[Rehearing denied August 28, 1972.]

*R. David Lewis, Walter Skelton* and *John F. Gautney,* for appellant.

*Bridges, Young, Matthews & Davis,* for appellees.

GEORGE ROSE SMITH, Justice. The appellees, two companies engaged in the manufacture of paper in Arkansas, brought these suits (consolidated in the court below) to enjoin the Commissioner of Revenues from collecting either the sales tax or the use tax upon the appellees' purchase of certain chemicals and other substances that are used in the manufacture of Kraft paper. The appellees base their claim to an exemption upon those sections of

the statutes defining and exempting sales for resale. Ark. Stat. Ann. §§ 84-1904 (i) and 84-3106 (b) (Repl. 1960).

Before the trial the parties narrowed the issues by stipulating that the appellees' purchases of some of the substances in question are exempt and that their purchases of certain other substances are not exempt. After an extended trial, at which the process of making Kraft paper was described in detail, the chancellor sustained the taxpayers' claimed exemption with respect to all substances not covered by the stipulation.

There is very little dispute about the essential facts. The Kraft process is used to make paper out of the cellulose in wood. In its natural state the wood used in paper making is about 50% cellulose, 30% lignin, and 20% carbohydrates, proteins, resins, and fats. In the Kraft process the wood, having first been shredded into chips, is "cooked" at high temperature in a chemical solution called white liquor, which separates the cellulose fibers from the rest of the wood. In that separation treatment the white liquor turns black in the course of absorbing the lignin and other unwanted components of the wood.

After the cooking procedure the black liquor is separated from the cellulose and is subjected to extensive recovery operations by which the chemicals in the black liquor are extracted for reuse. Ideally, all the black liquor would be separated from the cellulose, but such a 100% separation is too expensive to be economically possible. Consequently traces of the chemicals used in the liquor remain in the cellulose and can be detected by chemical analysis as being present in the finished Kraft paper.

The appellees' claims to exemption actually rest upon the presence of those chemical traces in Kraft paper. The statute provides that the purchase of property to be used in manufacturing is exempt, as a purchase for resale, only if the property so purchased "becomes a recognizable, integral part" of the manufactured product. Section 84-1904 (i). In seeking to bring the Kraft process within

the exclusionary language of the statute the appellees rely upon two basic facts established by their proof: One, the various chemicals and other substances in the cooking liquor are necessary to the manufacture of Kraft paper, and two, traces of the substances in question can be recognized by chemical analysis as being present in the finished product.

We find two flaws in the appellees' contention. First, the legislative intent is plainly to exempt purchases that are made for the purpose of resale, to the end that the same property will not be twice subjected to the same tax. Yet the appellees have not shown that they buy the chemicals in controversy for the purpose of reselling them, as distinguished from using the chemicals in the manufacturing process.

In fact, the proof is to the contrary. The appellees had the burden of proof, not only because they were the plaintiffs but also because they were asserting an exemption from taxes. *Bangs* v. *McCarroll*, 202 Ark. 103, 149 S.W. 2d 53 (1941). Yet, for the most part the appellees failed to adduce proof indicating that anything in the nature of a resale is actually involved.

With respect to sulphur the appellee did introduce relevant testimony, but it actually refutes their contention. Various chemical compounds containing sulphur are used in the cooking liquor. The appellees' witness Trahan testified that about 75% of the sulphur is recovered for reuse from the black liquor. Yet only minute traces of sulphur are to be found in Kraft paper. It necessarily follows that about 25% of the total sulphur in each batch of white liquor is consumed in the manufacturing process, presumably being discharged into the atmosphere or lost in some other way. Thus it is certain that the sulphur is not resold. To the contrary, it is consumed in the process of manufacturing Kraft paper.

The second flaw in the appellees' reasoning lies in its disregard of the statutory requirement that, to be exempt, property used in manufacturing must become an integral part of the finished product. The word "in-

tegral," as an adjective, has only a few closely related meanings. A primary and commonplace meaning, especially applicable to a part in its relation to the whole, is "constituting an essential part of a whole; necessary to completeness." Funk & Wagnalls New Standard Dictionary (1949). Other similar definitions are "essential to completeness," and "necessary to the completeness of the whole." Webster's Second and Third New International Dictionaries (1939 and 1961); Random House Dictionary of the English Language (1966).

Most of the chemical substances in dispute cannot be said to be physical components of the paper essential to its completeness. Rather, they are found in the paper only because it is not economically practical to remove them. For instance, there is a defoaming agent that is used simply to inhibit the formation of foam on the liquor in the cooking process. Traces of that defoaming agent can be found in Kraft paper, but they add nothing to the quality of the paper. Similarly, acetic acid is used to make dye more solvent, but, as the witness Trahan said: "We would not buy acetic acid to put in the paper —just to put acetic acid in it." Soap chips are used primarily to prevent the pulp from sticking to rolls used in the papermaking process. There is some indication that the soap chips add to the finish of the paper, but that effect appears to be merely incidental.

It does appear that eight of the substances not covered by the stipulation qualify for the statutory exemption, in that, according to the evidence in this record, they are added to the paper for the purpose of improving the finished product and become recognizable integral parts of it: Aluminum sulphate, sodium aluminate, Kelgin, Ludox, polyethylene, aluminum foil, titanium dioxide, and Zeolex. The decree is affirmed with respect to those substances.

We have not found it necessary to discuss the many out-of-state cases cited in the briefs, for the various statutes are so different from ours that those decisions are not helpful. Nor do we think that the exemption provided by Act 113 of 1967, during the short period of its existence

before its repeal, has any bearing upon this case, for the exemptions created by that act had to do with machinery and equipment used in the further processing of certain products.

Affirmed in part and reversed in part.