Shawn A. Womack, Justice, concurring in part and dissenting in part.
It is often said that timing is everything. This premise is especially true when it comes to recognition of taxable events. While I join the majority as to Part 1 in holding that sovereign immunity is to be applied as an affirmative defense that must be raised by the parties below, I dissent on the merits in Part 2 with respect to which regulation applies and, therefore, as to the value of the items withdrawn from stock for tax purposes.
This dispute is based on a disagreement as to whether items withdrawn from stock by FLIS Enterprises, Inc. ("Burger King"), should be taxed at the actual wholesale cost-original purchase price-or at the advertised retail price. Pursuant to their statutory authority, the Arkansas Department of Finance and Administration ("DFA") promulgated rules to determine the value that applies to items that have been withdrawn from stock. The regulations provide:
1. Withdrawal of purchased goods.
If a seller has a retail permit and purchases goods from its suppliers without paying tax to those suppliers claiming the "sale for resale" exemption and the seller withdraws the merchandise from stock and gives the merchandise to customers or other third parties, or uses the merchandise itself, then the value of this merchandise is a part of the seller's gross receipts or gross proceeds and the seller must remit the tax on the purchase price of the goods paid by the seller.
2. Withdrawal of manufactured or processed goods.
a. A business that manufactures or produces products and sells the products to third parties or at retail may at times transfer title to certain of those products to itself or give the products to another person or entity. The business should report and remit tax on the sales price of the products rather than the value of the raw materials used to manufacture or produce the products.
Ark. Admin. Code 006.05.212-GR-18(D)(1), (2) (Westlaw 2017).
In providing the analysis of this case, it is helpful to understand the purpose and function of the "sale for resale" exemption, as well as what benefit the taxpayer receives from it and what detriment the state endures from it. In the ordinary course of business, when a taxable item is sold, a gross-receipts tax is paid by the purchaser, collected by the seller, and remitted to the state. This tax is based on the actual purchase price of the item sold. Under the "sale for resale" exemption, if the described purchase is made by a person or entity in the business of reselling the purchased item, then the purchase is exempt from tax with the premise that the item will later be resold and the tax will attach at the time of the resale as applied to the price of the item at the time of that sale. The purpose of this exemption is to avoid multiple taxations of the same item at various points in the stream of commerce. See *274 Arkansas Glass Container Corp. v. Pledger , 320 Ark. 10, 12, 894 S.W.2d 599, 600 (1995). The benefit received by the purchaser for resale, in this case Burger King, is that it did not have to pay the tax on the original purchase price at the time of purchase. The detriment to the state is that it, temporarily, forgoes the collection of a tax at the time of the original purchase on the original purchase price.
In applying section (D)(1), as we should do in this case, when the purchased item is withdrawn from the stock of the taxpayer, a taxable event is triggered, and the taxpayer is responsible for paying the tax that would have been paid, based on the original purchase price of the item. This withdrawal from stock triggers a taxable event because it eliminates the possibility of the item being resold with a tax collection in the future. This application restores both parties to the position they would have been in had the exemption never been applied to the original purchase. It requires the taxpayer to pay the tax on the item that was purchased based on the price that was paid. It also makes the state whole, with no loss of revenue on the transaction.
The appellant argues, and the majority embraces, the idea that the benefit the managers receive is not a collection of ingredients, but rather a processed and complete "managers meal." This statement is both true and wholly irrelevant. If the question before us were a matter of determining the value of the manager's meal for the purpose of defining his or her compensation within the income tax system, then the description and characterization of the fully processed meals and their valuation at retail levels would be appropriate.
However, this is not an income tax case, and the subjects of taxation are not the managers. Therefore, what, if any, value the managers received in the form of a meal during their shifts is of no consequence to the issue before us. Rather, this is a gross-receipts-tax issue, and the target for the imposition of the tax is the appellee. As such, we should not focus on the value of the benefit received by the manager but rather on the actions taken by Burger King and the costs incurred by it.
This is where understanding the timing of the events becomes important. The items subject to taxation on the withdrawal from stock are the very items for which Burger King received a tax exemption when it purchased them. When Burger King purchases them, individually as ingredients, those items are placed into stock from which they are ordinarily pulled out as needed and placed into a process to create a Whopper or other menu item that is sold to a consumer at a marked-up retail price, at which time a tax is paid, collected, and remitted based on that sale. This process is what has caught the attention of the majority.
The alternative track that those items take creates a subtle but important distinction with respect to manager meals. On this track, which is at the heart of this case, Burger King acts as follows: (1) Burger King buys the individual ingredients; (2) Burger King places the individual ingredients into stock; (3) Burger King withdraws the individual ingredients from stock for a purpose other than creating an item to be sold at retail, in this case the manager meal. This is the moment, at the completion of step 3, when the timing and actions that create the taxable event are critical to understanding which section of the regulation applies. At this moment, when Burger King, as the taxpayer who received the tax exemption on the individual ingredients, withdraws these individual ingredients from stock for some purpose other than reselling them, the taxable event has occurred. Everything that comes *275 after that is irrelevant to the determination of the taxable value. It doesn't matter to what extent Burger King manufactures, produces, or processes the items after they have been withdrawn from stock because at the moment the taxable event is triggered section (D)(1) has already applied. No amount of action taken after the taxable event can reopen the process to allow the state to pursue the application of section (D)(2).
While its analysis is flawed, the majority does get some key facts right when it correctly states that "Burger King purchases individual food ingredients used to create its menu items from third-party suppliers. The ingredients are stored separately and utilized only as needed to complete specific orders. " When reading that sentence, the word "withdrawn" can be used interchangeably with "utilized" to understand the tax implications based on the state of the ingredients at the time of utilization or withdrawal which triggers the tax. The opinion goes on to quote Burger King's complaint: "Similarly, when a manager meal is consumed by a manager, [Burger King] withdraws the necessary ingredients from its stock and uses them to create the manager meal."
Finally, the majority incorrectly states that "section (2) specifies that if the goods withdrawn from stock and given away were 'manufactured or produced' by the seller, then the tax assessed is based on what would have been the sales price of the goods. " What section (D)(2)(a) actually states with respect to manufactured or process goods is that "the business should report and remit tax on the sales prices of the products rather than the value of the raw materials used to manufacture or produce the products." Therefore, if an application of section (D)(2) were to prevail, when using the actual language rather than paraphrasing the language, the tax would be placed on the "sales price" not on what the majority erroneously paraphrases as "what would have been the sales price." If section (D)(2) applies, and if Burger King gives the manager a meal at a cost of zero, then the tax rate is applied to the sales price of zero and the tax to be paid is zero. But, because section (D)(1) applies, the correct application of the tax is to the original price of the goods paid by the seller, the wholesale price.